**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION, YOUNGSTOWN**

| | | |
|---|---|---|
| **CHRISTINA BODNAR, TERRY MANLEY, JOSEPH SAMEK** and | * | **CASE NO.**: _____ |
| **SAMEK AUTOMOTIVE REPAIR, LLC** Individually and on behalf of all others similarly situated | * | Judge |
| | * | |
| Plaintiffs | * | **JURY TRIAL DEMANDED** |
| v. | * | |
| **NORFOLK SOUTHERN CORPORATION,** and **NORFOLK SOUTHERN RAILWAY COMPANY** | * | |
| | * | |
| Defendants | * | |

---

## CLASS ACTION COMPLAINT

Plaintiffs Christina Bodnar, Terry Manely, Joseph Samek, and Samek Automotive Repair, LLC, individually and on behalf a putative class of all others similarly situated ("Class Members" or "Class"), bring this lawsuit against Defendants Norfolk Southern Corporation ("NSC") and Norfolk Southern Railway Company ("NSRC"), and upon information and belief, allege as follows:

## INTRODUCTION

1.      This is a Class Action Complaint seeking redress for residents and businesses located in and around the February 3, 2023 Norfolk Southern Freight Train 32N derailment and subsequent "controlled" release and burn in East Palestine, Ohio, that resulted in death to wildlife, contamination of, and exposure to, massive amounts of vinyl chloride and other toxic chemicals—

including ethylene glycol monobutyl ether, butyl acrylate, ethylhexyl acrylate, isobutylene, benzene residue, and other combustible liquids. As a result of this derailment, the Class has suffered, among other things, loss of use and enjoyment of property, property damage, loss of property value, emotional distress, and economic damages as alleged more specifically below.

2.      The chemicals Norfolk Southern discharged into the air, water, and soil of East Palestine, Ohio and the surrounding communities include the known carcinogen vinyl chloride and numerous chemicals that cause vomiting and skin, nose, eye, and respiratory tract injuries and irritation.

3.      This action is brought by Plaintiffs Christina Bodnar, Terry Manley, and Joseph Samek on behalf of themselves and a class of all other similarly situated persons who: (i) own property within the vicinity of the February 3, 2023 train derailment and resulting toxic chemical explosion; or (ii) reside within the vicinity of the February 3, 2023 train derailment and resulting toxic chemical explosion and were forced to (a) evacuate their homes, or (b) shelter within their homes due to the incident.

4.      This action is also brought by Plaintiff Samek Automotive Repair, LLC, on behalf of itself and a class of all other similarly situated businesses that were forced to close, and/or were otherwise adversely affected by the February 3, 2023 train derailment and resulting toxic chemical explosion.

## THE PARTIES

5.      At all relevant times, Plaintiff Christina Bodnar was an adult citizen of Ohio and the occupier of the real property located at 645 Moore Lane, East Palestine, Columbiana County, Ohio 44413, and owner of two adjacent lots of real property, all within one mile of the derailment and explosion site.

6.     At all relevant times, Plaintiff Terry Manley was an adult citizen of Ohio and the owner-occupier of the real property located at 96 Wood Street, East Palestine, Columbiana County, Ohio  44413, within one mile of the derailment and explosion site

7.     At all relevant times, Plaintiff Josepha Samek was an adult citizen of Ohio and the owner-occupier of the real property located at 5058 Wheathill Road, East Palestine, Columbiana County, Ohio  44413, within one mile of the derailment and explosion site.

8.     At all relevant times, Plaintiff Samek Automotive Repair, LLC was an Ohio domestic limited liability company with a principal place of business located at 5058 Wheathill Road, East Palestine, Columbiana County, Ohio  44413, within one mile of the derailment and explosion site.

9.     Defendant NSC is a corporation duly organized and existing under and by virtue of the laws of the Commonwealth of Virginia with its principal place of business located at 1200 Peachtree Street, NE, Atlanta, Georgia 30308.

10.     Defendant NSRC is a wholly owned subsidiary of NSC.  NSRC is a Class I railroad corporation duly organized and existing under and by virtue of the laws of the Commonwealth of Virginia with its principal place of business located at 1200 Peachtree Street, NE, Atlanta, Georgia 30308.

11.     At all relevant times, NSC and NSRC acted individually, as well as by and through one another and their respective officers, directors, executives, employees, contractors, subcontractors, and/or agents.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over the claims asserted in this action under 28 U.S.C. § 1332 because there is complete diversity between Defendants and at least one

3

member of the class; there are more than one hundred members of each class; and the amount in controversy exceeds $5,000,000 exclusive of interests and costs.

13.    On information and belief, Defendants have systematically transacted and conducted business in the State of Ohio, including transportation of hazardous materials by train, and these causes of action arise, in part, from the same.

14.    On information and belief, at all relevant times, Defendants expected or should have expected that their acts would have consequences within the State of Ohio.

15.    On information and belief, at all relevant times, Defendants derived and continue to derive substantial revenue from providing services in the State of Ohio.

16.    On information and belief, at all relevant times, Defendants committed tortious acts within the State of Ohio causing injury within the State of Ohio, out of which act(s) these causes of action arise.

17.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events giving rise to Plaintiffs' claims occurred, in part, in the Northern District of Ohio, Representative Plaintiffs were injured as a result of tortious activity in this District and Defendants otherwise have sufficient contacts with this District to justify it being fairly brought into this District.

## **FACTUAL ALLEGATIONS**

*The Train Derailment*

18.    On Friday February 3, 2023, at approximately 9:00 p.m., Norfolk Southern Freight Train 32N, consisting of 141 cars (the "Train") and operated by NSRC, was carrying abnormally dangerous and ultrahazardous chemicals including, but not limited to, vinyl chloride, while traveling from Illinois to Pennsylvania.

4

19.     The Train was backloaded with 40% of its weight with the heaviest tanker cars, at the rear. Lighter cars were loaded between the heavy rear tankers and the front engine.

20.     The Train was traveling from Madison County, Illinois to Conway, Pennsylvania, which required a downhill route.

21.     NSC is a publicly traded company with a market value of $55 billion and reported record profits of $4.8 billion in 2022.  James A. Squires, its then Chairman and Chief Executive Officer, made Thirteen Million Two Hundred Sixty-One Thousand Two Hundred Seventy-Eight and 00/100 Dollars ($13,261,278.00) in total compensation in 2021.

22.     Due to cost cutting measures, NSC's workforce at the time of the East Palestine disaster on February 3, 2023 was about one-third smaller than it was in 2013, although NSCR moved more freight and operated more trains as of the time of the derailment as it did in 2013..

23.     NSC has also fought against regulations requiring trains hauling abnormally dangerous materials such as those hauled by this Train, to be designated "high hazard" and meet more stringent safety requirements.

24.     NSC's total accidents or safety-related incidents rose on a per-track-mile basis over the past decade by 82 percent.

25.     The "crew" that operated the 141-railcar Train consisted of two NSRC rail workers, an engineer and a conductor, and one trainee.

26.     At 8:12 PM, approximately 20 miles from its eventual derailment, the Train passed Butech Bliss, an industrial equipment manufacturer in Salem, Ohio.

27.     At that time, railcar number twenty-three in the train glowed brightly on the bottom at the wheel axle as it passed.

28.     A minute later and a mile down the track, a camera at the Fresh Mark, a meat

processing plant, captured the same glowing footage, showing a malfunctioning railcar axle.

29.     On the railroad tracks in front of Fresh Mark, an instrument called a hot box detector was in place to scan the temperature of passing train axles to ensure they were not overheated. Hot box detectors are typically placed every 10 to 20 miles along a rail.

30.     The hot box near Fresh Mark sensed the overheated, malfunctioning railcar axle on car number twenty-three.

31.     Prior to that, the Train passed over another hot box detector which also registered a hot wheel journal on the same tank car number 23.

32.     The Train passed at least three hot box detectors, with each passing registering a higher temperature, prior to derailment.

33.     The wheel bearing reading at the East Palestine, Ohio hot box detector read 253 degrees hotter than the ambient temperature, and well above the 200-degree threshold considered critical.

34.     The critical audible alarms sounded, instructing the crew to stop.  As the crew began to brake and slow the Train, car number 23 derailed causing the automatic emergency brakes to engage and the train made a full stop.  As a result, a total of 38 railcars derailed, 11 of which contained hazardous materials.  Five of the derailed cars contained vinyl chloride.

35.     During and after the derailment, the hazardous chemicals, including, but not limited to vinyl chloride, ignited.

36.     The resulting fire continued to burn with increasing intensity the following Saturday, Sunday, and Monday (February 3-6, 2023).

37.     On Friday February 3, 2023, the fire was large enough to be detected by the Pittsburgh, Pennsylvania weather radar for several hours. The fire appeared to reach its peak

intensity around 10:40 p.m. when brighter colors appeared on radar and the smoke plume had traveled below Beaver Falls, Pennsylvania.

38.    The radar also detected a value of 31.5 decibels at 10:40 p.m., which is the equivalent of moderate rain/snow. The smoke plume was blown to the south and east due to a northwest wind that was blowing over the fire, traveling at least as far as Bridgewater, Pennsylvania at that time.

39.    Aerial surveillance showed an entanglement of rail cars with fires still burning and heavy smoke continuing to billow from the scene as officials tried to determine what was in each car from just a view of their exterior labels.

40.    Officials issued a shelter-in-place order for the entire town of East Palestine, affecting roughly 5,000 people, and an evacuation order was put in effect within a mile of the train derailment at 1020 East Taggart Street in East Palestine, Ohio as of early Saturday, February 4, 2023.

41.    Upon information and belief, one railcar carrying vinyl chloride became a focus of concern when its malfunctioning safety valves prevented the release of the chemical inside from its container, meaning that pressure was building to unsafe levels inside the steel shell.

42.    On Sunday, February 5, 2023, as the fires continued to burn, vinyl chloride temperature increases raised fears of a catastrophic tanker failure, which could cause an explosion with the potential of deadly shrapnel.

43.    On Monday, February 6, 2023, a drastic temperature change took place within the railcar with malfunctioning safety valves, increasing the potential of a catastrophic tanker failure and explosion which could result in the release of not only toxic chemicals, but also deadly shrapnel traveling up to one mile.

44.     In response, at 4:30 p.m. on Monday, February 6, 2023, NSC and/or NSRC intentionally blew holes in each of the five derailed rail cars containing vinyl chloride to drain the chemical into a trench where flares would then ignite and burn the vinyl chloride away.

45.     This process was referred to as a "controlled release." Following the explosive and fiery "controlled release," a large plume of thick black smoke formed a mushroom cloud, which dispersed toxic hydrogen chloride and phosphene gas into the atmosphere, causing further contamination by, and exposure to, toxic chemicals as seen in the pictures below:





46.     Phosgene is a highly toxic gas that can lead to choking, chest constriction, and, in the most acute exposures, possibly even death.  Phosgene is so toxic that it was used as a chemical weapon in World War I.

47.     Upon information and belief, the "controlled release" of vinyl chloride released hundreds of thousands of pounds of phosgene into the air.

48.     Hydrogen chloride, which has a pungent odor, can irritate the throat, nose, and skin.

Hydrogen chloride is extremely unstable and bonds with water in the atmosphere to form hydrochloric acid.

49.     Upon information and belief, the "controlled release" of vinyl chloride released hundreds of thousands of pounds of hydrochloric acid into the air.

50.     The smoke from the "controlled release" was trapped from rising higher into the atmosphere due to an inversion layer at around 3,000 feet. In other words, the toxic plume from the mushroom cloud reached a level in the atmosphere where it was unable to continue to rise vertically, so it began to spread out horizontally in a thick cloud.

51.     Fumes, sediment, and a rise in particulate pollution from the derailment, fire, toxic chemical disbursement, and subsequent explosion were reported in an area encompassing at least 30 miles around the derailment site.

52.     For example, the EPA particulate pollution monitor in Youngstown, Ohio, more than 23 miles from the derailment site, more than tripled in the amount of small particles in the air on February 6, 2023, and continued to rise. As of February 9, 2023, the particulate levels in Youngstown, Ohio were five times higher than they were prior to February 6, 2023.

53.     Citizens of East Palestine, Ohio and other areas miles away have already reported environmental issues including poor air quality and a pervasive, terrible smell as well as an expansive host of health issues including headaches, nausea. Cough, sinus problems, a burning sensation in the eyes, lung complications, burning throat, and dizziness.

54.     Upon information and belief, contamination and damage to local streams, rivers, and other bodies of water including, but not limited to, the Ohio River, occurred from the release of toxic chemicals and/or the water runoff from the derailment and resulting chemical explosion, leading to the death of fish, wildlife, and other local farm or household animals.

55.     Upon information and belief, the derailment, subsequent chemical spill, fire, and toxic explosion were caused by the negligence, carelessness, recklessness, and/or intentional acts of the Defendants in the ownership, operation, inspection, maintenance, and repair of the subject train, rail cars, and track system, as well as the design and performance of the "controlled release."

*The Hazards of Vinyl Chloride*

56.     Vinyl chloride monomer ("vinyl chloride") is classified by the EPA as a Group A human carcinogen—the most dangerous to human health.

57.     Vinyl chloride exposure can affect the cardiovascular, respiratory, and central nervous systems, and can cause death, difficulty breathing, lung irritation, chest pains, coughing, dizziness, headaches, eye irritation, and loss of consciousness.

58.     Vinyl chloride is a toxic chemical that is unstable and prone to explode if not maintained and handled with proper methods and conditions.

59.     Specifically, just minutes of exposure to high, but attainable concentrations (over 1,000 ppm) of vinyl chloride may cause central nervous system depression with effects including dizziness, drowsiness, disorientation, tingling, numbness or burning sensation of the hands and feet, impaired vision, nausea, headache, difficulty breathing, cardiac arrhythmias, unconsciousness, and even death.

60.     Exposure to higher concentrations of vinyl chloride can cause death because of central nervous system and respiratory depression.

61.     Vinyl chloride exposure also creates an increased risk of a rare form of liver cancer (hepatic angiosarcoma), as well as primary liver cancer (hepatocellular carcinoma), brain and lung cancers, lymphoma, and leukemia.

62.     According to the National Transportation Safety Board ("NTSB"):

Vinyl chloride [CAS # 75-01-4] is a colorless gas with a mild, sweet odor that is used to make

polyvinyl chloride (PVC). It is a gas at room temperature; however, it is shipped as a liquid under pressure. It is highly flammable and vapor/air mixtures are explosive. The odor threshold for detection is about 3,000 parts per million (ppm) in air. The Occupational Safety and Health Administration (OSHA) regulates occupational exposures to vinyl chloride under 29 CFR 1910.1017. Paragraph © of the standard mandates that no employee may be exposed to vinyl chloride at concentrations greater than 1 ppm averaged over any 8-hour period; no employee may be exposed at concentrations greater than 5 ppm averaged over any period not exceeding 15 minutes; and that no employee may be exposed to vinyl chloride by direct contact with liquid vinyl chloride. ***Due to the significant difference between the odor threshold and the acceptable occupational exposure levels, workers can easily be overexposed without becoming aware of vinyl chloride's presence.  The odor threshold is too high to provide adequate warning for hazardous conditions.***

63.     Just one pound of vinyl chloride released into the atmosphere can contaminate five acres to a level of 2 ppm.

64.     In 2012, a train crashed in Paulsboro, New Jersey, spilling 23,000 gallons of vinyl chloride; a 2014 New Jersey Department of Health study found that half the residents of that town had health problems caused by the spill two years later.

65.     Upon information and belief, the train derailment and resulting toxic chemical explosion released approximately 115,580 gallons—1 million pou—- of vinyl chloride.

## THE COMMUNITY AFTER THE DERAILMENT

66.     As stated above, Defendants released numerous hazardous chemicals into the air, soil, and water of East Palestine and the surrounding communities.

67.     While there have been some governmental reports of detected safe levels of chemical concentrations in the air and water, such reports have largely limited their focus to volatile organic compounds.

68.     The train also released chemicals other than volatile organic compounds, including semi-volatile organic compounds which do not diffuse as easily, and are more persistent in waterways.

69.     Further, a document NSC sent to the EPA that was recently made public, did not

list soil removal among completed cleanup activities in and around East Palestine.

70.    Removal of chemically contaminated soil is critical as contaminated soil will continue to leech contaminants into the air and into the ground every time it rains.

71.    Defendants cannot be trusted to monitor the environmental health of the affected communities or monitor the physical health of their residents, and this Court must order a rigorous, independent process to do so, as requested in this Complaint.

## CLASS ALLEGATIONS

72.    Plaintiffs seek relief pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(1) and/or (b)(3) on behalf of themselves and a class of all other similarly situated  of a Class defined as follows:

> **All individuals who resided, owned property, worked or operated businesses within a 30-mile radius of 1020 East Taggart Street, East Palestine, Ohio  44413 as of February 3, 2023 (the "Class Zone").**

73.    Excluded from the Class are: (1) Defendants and any of their affiliates, parents or subsidiaries; all employees of Defendants; all persons who make a timely election to be excluded from the Class; government entities; and the judges assigned to this case, their immediate families, and court staff; and (2) insurers and insurance syndicates whose claims for damages regarding the February 3, 2023 train derailment and resulting toxic chemical explosion, arise out of a right of subrogation, whether equitable, contractual or otherwise.

74.    Also excluded from the Class are any claims of physical manifestation of personal or bodily injury.

75.    Plaintiffs reserve the right to amend or modify the Class definition after having had an opportunity to conduct additional investigation and discovery.

76.    The proposed Class meets the criteria for certification under 23(a) and 23(b)(1)

and/or (b)(3).

*Numerosity and Ascertainability*

77.     This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1). The members of the Class are so numerous and geographically dispersed that the joinder of all members is impractical.

78.     While the exact number of Class Members is unknown to Plaintiffs at this time, it is ascertainable; the proposed Class includes thousands of residents and businesses who were unlawfully exposed to vinyl chloride and other toxic chemicals or who had property contaminated by unlawful exposure to vinyl chloride and other toxic chemicals and suffered damages. Class members may be notified of the pendency of this action by recognized, Court-approved notice dissemination methods, which may include U.S. mail, electronic mail, internet postings, and/or published notice.

79.     This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) because this action involves common questions of law and fact that predominate over any individual Class Members.

80.     The common questions include, without limitation, the following:

    a.  Whether Defendants owed a duty of care to Plaintiffs and the Class

    b.  Whether Defendants operated their railway negligently, recklessly or intentionally.

    c.  Whether Defendants caused the accident resulting in the derailment, fire, subsequent leak of toxic chemicals, resulting explosion, contamination and evacuation and/or "shelter in place" orders;

    d.  Whether the Plaintiffs and Class Members have suffered a loss of use and enjoyment of property, property damage, diminution of property value, extra expenses or other economic damages as a result of the Defendants' acts or omissions as set forth above;

e.  Whether Plaintiffs' and Class Members' businesses have suffered a loss of income and/or diminution in value due to either (i) the leak of vinyl chloride or (ii) the stigma associated with being within the evacuation and/or "shelter in place" zones;

f.  Whether Plaintiffs and Class Members have suffered damages to their businesses due to forced closings and/or the evacuation or "shelter in place" orders;

g.  Whether Defendants are liable to Plaintiff and the Class for punitive damages resulting from the derailment and vinyl chloride spill;

h.  Whether Defendants breached their duty to warn Plaintiffs and the Class of and to protect Plaintiff and the Class from the long-term health risks and consequences of exposure to high levels of vinyl chloride and other toxic chemicals;

i.  Whether medical monitoring and early detection will provide benefits to Plaintiffs and the Class; and

j.  Whether Plaintiffs and the Class are entitled to relief.

*Typicality*

81.  This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because Plaintiffs' claims are typical of the claims of the Class Members and arise from the same course of conduct by Defendants and the same train derailment and spill of hundreds of thousands of gallons of toxic chemicals.

82.  Plaintiffs own property, reside in and/or operate a business within the Class Zone surrounding the train derailment and toxic chemical explosion, and owned property, resided and/or operated a business in the Class Zone at all relevant times.

83.  Plaintiffs' claims are based upon the same legal theories as those of the other Class Members.

84.  Plaintiffs and the other Class Members sustained damages as a direct and proximate result of the same wrongful acts or omissions in which Defendants engaged.

15

85.     Plaintiffs' damages and injuries are akin to those of Class Members, and Plaintiffs seek relief consistent with the relief of Class Members.

*Adequacy*

86.     This action satisfies the requirements of Fed. R. Civ. P. 23(a)(4) because Plaintiffs will fairly and adequately represent and protect the interests of Class Members.

87.     Plaintiffs have retained counsel with substantial experience in prosecuting complex class action and environmental toxic tort litigation, including successful class actions involving mass displacements caused by the release of dangerous substances that are similar to that at issue here.  Further, Plaintiffs' counsel has decades of experience litigating a myriad of claims against railroads and has experience and knowledge relevant to railroad operations and litigation that will provide great benefit to the putative Class.

88.     Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Class Members and have the financial resources to do so. Neither Plaintiffs nor their counsel has interests adverse to those of the Class Members.

89.     Plaintiffs intend to vigorously prosecute this case and will fairly and adequately protect the interests of Class Members.

*Inconsistent or Varying Adjudications and Risk of Impediments to Other Class Members'*
*Interests*

90.     This action satisfies the requirements of Fed. R. Civ. P. 23(b)(1); a class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action.

91.     The quintessential purpose of the class action mechanism is to permit litigation against wrongdoers even when damages to individual plaintiffs may not be sufficient to justify individual litigation.

92.     Here, the damages suffered by Plaintiffs and the Class are relatively small compared to the burden and expense required to individually litigate their claims against Defendants, and thus, individual litigation to redress Defendants' wrongful conduct would be impracticable.

93.     Individual litigation by each Class Member would also strain the court system. Individual litigation creates the potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system.

94.     By contrast, the class action device presents far fewer management difficulties and provides the benefits of a single adjudication, economies of scale, and comprehensive supervision by a single court.

*Superiority*

95.     This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3) because a class action is superior to other available methods for the fair and efficient group-wide adjudication of this controversy. The common questions of law and of fact regarding Defendants' conduct and the interpretation of the common language in their insurance policies predominate over any questions affecting only individual Class Members.

96.     Because the damages suffered by certain individual Class Members may be relatively small, the expense and burden of individual litigation would make it very difficult for all individual Class Members to redress the wrongs done to each of them individually, such that many Class Members would have no rational economic interest in individually controlling the prosecution of specific actions, and the burden imposed on the judicial system by individual litigation by even a small fraction of the Class would be enormous, making class adjudication the superior alternative under Fed. R. Civ. P. 23(b)(3)(A).

17

97.     The conduct of this action as a class action presents far fewer management difficulties, far better conserves judicial resources and the parties' resources, and far more effectively protects the rights of each Class Member than would piecemeal litigation. Compared to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation, the challenges of managing this action as a class action are substantially outweighed by the benefits to the legitimate interests of the parties, the Court, and the public of class treatment in this Court, making class adjudication superior to other alternatives, under Fed. R. Civ. P. 23(b)(3)(D).

98.     Plaintiffs are not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Rule 23 provides the Court with authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on motion of Plaintiffs or on its own determination, certify multistate classes for claims sharing common legal questions; utilize the provisions of Rule 23(c)(4) to certify any particular claims, issues, or common questions of fact or law for class-wide adjudication; certify and adjudicate bellwether class claims; and utilize Rule 23(c)(5) to divide any Class into subclasses.

**SUPPLEMENTAL MEDICAL MONITORING CLASS ALLEGATIONS**

99.     As set forth above, Plaintiffs are not asserting claims for the physical manifestation of a current toxicity injury, and have no adequate remedy at law, rendering declaratory, injunctive, and other equitable relief appropriate.

100.     As a direct and proximate result of Defendant's wrongful conduct as set forth above, Plaintiffs and the Class Members have been exposed to toxic substances, toxic fumes and carcinogens and thereby suffer, and will continue to suffer a significantly increased risk of serious

injury and diseases. This increased risk makes periodic diagnostic medical testing and examinations necessary.

101.    Medical monitoring will reduce the risk of illness and of more severe illness by using medical tests to detect who has been affected by exposure to vinyl chloride and other toxic substances released by the derailment, and to provide medical intervention that will prevent or reduce the deterioration and long-term health and wellbeing of Plaintiffs and the Class Members they seek to represent. Medical monitoring and testing procedures, including clinical examinations, exist which make the early detection of exposure to toxic substances, toxic fumes and carcinogens, and early detection of disease, feasible and beneficial.

102.    The increased susceptibility to injuries and irreparable threat to the health of the Plaintiffs and members of the Class resulting from their exposure to vinyl chloride and other toxic substances can be appropriately mitigated and addressed only by the creation of a comprehensive medical monitoring program, supervised by the Court, and funded by the Defendant, that: (a) notifies individuals who have been exposed to vinyl chloride and other toxic substances of the potential harm from such exposure and the need for periodic testing and examination; (b) provides early detection and treatment of disease and injuries caused by exposure to vinyl chloride and other toxic substances; and (c) gathers and forwards to treating physicians information related to the diagnosis and treatment of injuries and diseases which may result from exposure to vinyl chloride and other toxic substances.

103.    By reason of the Defendants' conduct, members of the Class have suffered and will continue to suffer latent, undiagnosed and impending irreparable injury, warranting a preliminary injunction and an expedited trial on the merits under Fed. R. Civ. P. 65, and a permanent decree granting the relief requested herein. Plaintiffs and the Class they seek to represent will suffer

irreparable injury unless the Court so acts.

104.    By reason of Defendants' conduct, Plaintiffs and the Class should be awarded the quantifiable costs of such medical monitoring program.

**COUNT I**
**NEGLIGENCE**
(*On Behalf of All Plaintiffs Against All Defendants*)

105.    Plaintiffs repeat, reallege, and incorporate by reference all allegations in the preceding paragraphs as if fully re-written herein..

106.    Defendants owed a duty of care to operate their railway, and the Train, in a reasonable manner which would not cause Plaintiff and Class Members harm.

107.    Defendants breached that duty of care by its unreasonably dangerous, careless, reckless and unsafe operation of its railway and of the Train.

108.    Defendants breach of that duty was the direct and proximate cause of thefderailment, fire, and catastrophic release of of vinyl chloride and other toxic chemicals.

109.    Defendants further breached its duty to Plaintiffs and Class members by its negligent, careless, and reckless response to the derailment of the Train and its willful failure to take immediate steps to ameliorate the effects of its release of chemicals into the air, soil and water.

110.    Upon information and belief, Defendants prioritized the immediate resumption of its rail operations over, and to the detriment of, taking immediate steps to address the environmental catastrophe it unleashed on East Palestine and the surrounding communities.

111.    Among other things, Defendants breached its duty of care to Plaintiffs and the Class by their following failures of operations for which it had a duty of reasonable care under applicable regulations, industry practices, and/or the common law:

a)    Defendants failed to operate, maintain, inspect and/or repair the railway and railcars in such a way to ensure their safe and proper operation, particularly when

20

transporting hazardous materials such as vinyl chloride, butyl acetate, benzene residue, and other toxic chemicals;

b) Defendants failed to ensure proper procedures or systems for timely identifying any malfunctions of the railway and railcars in order to prevent or mitigate derailments while transporting such hazardous materials;

c) Defendants failed to ensure proper safety procedures in the event of a mechanical malfunction of the railway or railcars while transporting such hazardous materials.

d) Defendants failed to ensure a proper mechanism for stopping or slowing malfunctioning railcars in a timely manner to avoid a derailment while transporting such hazardous materials;

e) Defendants failed to prevent over-loading the train with too many railcars or materials;

f) Defendants failed to load the railcars in a proper way, avoiding placement of heavier cars in the rear, with particular consideration to whether the planned route is downhill;

g) Defendants failed to adequately Adequately staff positions that plan, prepare, coordinate, and oversee transportation of hazardous materials by railcar;

h) Defendants failed to properly hire, train, manage, oversee, and supervise their agents, servants, employees, including but not limited to the train engineer and dispatcher concerning the operation of the train on February 6, 2023;

i) Defendants failed to properly train their agents, servants, and employees, including but not limited to the train engineer, conductor and dispatcher, concerning the operation of the train and issues that arose on February 3, 2023;

j) Defendants failed to properly determine the adequacy and skill of their agents, servants, employees, including but not limited to, the train engineer, conductor and dispatcher, concerning the operation of the train on February 3, 2023;

k) Defendants failed to ensure that their agents, servants, employees, including but not limited to, the train engineer and dispatcher, were properly and adequately instructed and trained while transporting hazardous substances, including, but not limited to, vinyl chloride;

l) Defendants failed to properly instruct and adequately train their agents, servants, employees, including but not limited to the train engineer and dispatcher concerning safety and emergency procedures in the event of a possible derailment;

21

m)  Defendants failed to route railcars carrying hazardous materials in such a way as to avoid populated areas in order to minimize the risk of accidental exposure

n)  Defendants failed to adequately warn those in danger of exposure to hazardous chemicals;

o)  Defendants failed to institute proper procedures and training for response to the mechanical malfunction of a rail car;

p)  Defendants failed to institute proper procedures and training for response to derailment of railcars containing hazardous materials;

q)  Defendants failed to institute proper procedures to avoid exposing hazardous materials to the environment;

r)  Defendants failed to have an emergency response plan to contain the spread of hazardous materials into the surrounding air, water, real property, and persons in the event of derailment;

s)  Defendants failed to timely implement such an emergency response plan;

t)  Defendants failed to transport and handle hazardous materials in a manner which would not cause Plaintiffs harm, as Plaintiffs were foreseeable victims located within the scope of the risk created by Defendants' conduct;

u)  Defendants failed to properly dispose of or otherwise eliminate the hazardous materials from the derailment site, including the use of techniques that further exposed Plaintiff and surrounding areas to phosgene and hydrogen chloride during a "controlled release" of the hazardous materials;

v)  Defendants failed to evacuate an appropriate geographical area to avoid exposing persons nearby to hazardous materials and causing injury;

w)  Defendants failed to timely evacuate an appropriate geographical area to avoid exposing persons nearby to hazardous materials and causing injury;

x)  Defendants failed to accurately make known the risk of catastrophic injury and illness from exposure to hazardous materials, including vinyl chloride, butyl acetate, benzene residue, combustible liquids, phosgene, and hydrogen chloride, to persons at risk of exposure, including those outside the evacuation zone;

y)  Defendants failed to accurately make known the risk of exposure faced by those persons at risk of exposure, including those outside the evacuation zone; and

z)  Defendants failed to contain the spread of hazardous materials and by-products,

22

including vinyl chloride, butyl acetate, benzene residue, combustible liquids, phosgene, and hydrogen chloride, into the surrounding air, water, real property, and persons.

112.    Defendants owed and breached a duty of reasonable care commensurate with the risk of transporting hazardous materials, including vinyl chloride, butyl acetate, benzene residue, and combustible liquids by railcar.

113.    Defendants owed and breached a duty of reasonable care commensurate with the release and burning of those hazardous materials, including the resultant release of phosgene, and hydrogen chloride.

114.    Given the likelihood of contamination of neighboring areas and exposure to their residents, Defendants had a duty to investigate the extent to which the controlled release and burn of hazardous materials, including vinyl chloride, butyl acetate, benzene residue, combustible liquids, phosgene, and hydrogen chloride was likely contaminating property at levels to materially increase nearby residents' likelihood and risk of developing cancer and other diseases.

115.    The damages to Plaintiffs and class members were also caused by or aggravated by the fact that Defendants failed to take necessary actions to mitigate the danger associated with their operations.

116.    As a direct and proximate result of Defendants' use, emission, discharge, disposal, distribution and release of hazardous materials throughout a 30-mile radius surrounding the derailment site, Plaintiffs presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience and emotional distress, an increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness.

117.    Defendants' conduct as alleged herein shows that Defendants acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

**COUNT II**
**NEGLIGENCE *PER SE***
**(*On behalf of All Plaintiffs Against All Defendants*)**

118.    Plaintiffs repeat, reallege, and incorporate by reference all allegations in the preceding paragraphs of this Complaint as if fully rewritten herein.

119.    As a railroad operating within the United States, Defendants are governed by the Federal Railroad Administration ("FRA").

120.    Defendants violated at least one safety regulation governing the operation of railroads, specifically, 49 CFR § 215.115, which prohibits a railroad from placing or continuing in service a rail car with a defective roller bearing.

121.    On February 3, 2023, the twenty-third car of the Train had a defective roller bearing, as defined at 49 CFR § 215.115(a)(1)(ii) due to its overheating, and Defendants continued the Train in service in violation of 49 CFR § 215.115(a), leading to its derailment and catastrophic release of toxic chemicals.

122.    Said breach of Defendants' regulatory duty, caused the damages sustained by Plaintiffs and constituted negligence *per se*.

123.    As a direct and proximate result of Defendants' negligence *per se*, Plaintiffs presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience and emotional distress, an increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness.

24

## COUNT III
## STRICT LIABILITY
*(On Behalf of All Plaintiffs Against All Defendants)*

124.    Plaintiffs repeat, reallege, and incorporate by reference all allegations in the preceding paragraphs of this Complaint as if fully rewritten herein.

125.    Defendants are strictly liable for the injuries and damages suffered by Plaintiffs and the Class pursuant to the provisions of the Restatement (Second) of Torts §§ 519 and 520.

126.    The transportation of the toxic and flammable substance vinyl chloride is an abnormally dangerous and/or ultrahazardous activity under the definition set forth in Restatement (Second) of Torts §§ 519 and 520.

127.    The transportation of the additional toxic chemicals aboard the Train that were released by its derailment is also an abnormally dangerous and/or ultrahazardous activity under the definition set forth in Restatement (Second) of Torts §§ 519 and 520.

128.    The Defendants engaged in an abnormally dangerous and/or ultrahazardous activity for which common law strict liability applies for transporting hazardous substances, including but not limited to vinyl chloride.

129.    Defendants, in fact, did so through a residential community in a manner the Defendants knew to be dangerous and without taking proper precautions.

130.    Had the Defendants not engaged in the abnormally dangerous and/ or ultrahazardous activity, Plaintiffs would not have had their property contaminated or been exposed to dangerous levels of vinyl chloride and other toxic substances and endured the other damages set forth herein.

131.    As a direct and proximate result of the Defendants' acts or omissions in the course of conducting this abnormally dangerous and/or ultrahazardous activity, Plaintiffs presently suffer,

and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience and emotional distress, an increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness.

132.     Accordingly, the Defendants are strictly liable, jointly and severally, without regard to fault, for all of the damages to Plaintiffs and the Class, which were a direct and proximate result of the train derailment and release of hazardous substances which harmed Plaintiffs and the Class as described above.

133.     Defendants' conduct as alleged herein shows that Defendants acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

**COUNT IV**
**MEDICAL MONITORING**
*(On Behalf of Plaintiffs Christina Bodnar, Terry Manley, Joseph Samek and individual Class Members Against All Defendants)*

134.     Plaintiffs repeat, reallege, and incorporate by reference all allegations in the preceding allegations of the Complaint as if fully rewritten herein.

135.     Plaintiffs Christina Bodnar, Terry Manley, Joseph Samek, and the individual Class Members have been significantly exposed to vinyl chloride and other toxic substances at levels that are far higher than normal background levels. These toxic substances, including vinyl chloride and its byproducts like hydrochloric acid and phosgene, are dangerous toxins proven to cause cancer and other diseases in humans.

136.     The hazardous materials carried by the train, including vinyl chloride, are highly toxic substances.

137.     Plaintiff and Class Members were significantly exposed to these toxic substances, including vinyl chloride and its byproducts like hydrochloric acid and phosgene, due to Defendants' tortious actions, including Defendant's negligent, ultrahazardous, and willful and wanton conduct as alleged herein.

138.     As a proximate result of their exposure to these toxic substances, including vinyl chloride and its byproducts like hydrochloric acid and phosgene, Plaintiffs and Class Members have a significantly increased risk of developing diseases and cancer, including liver cancer, brain cancer, angiosarcoma of the liver, Raynaud's syndrome and acro-osteolysis. This increased risk makes periodic diagnostic medical examinations reasonably necessary.

139.     This increased risk will warrant a reasonable physician to order monitoring.

140.     Early diagnosis of these diseases and cancers has significant value for members of the Class because such diagnoses will help them monitor and minimize any resulting harm.

141.     Monitoring procedures exist that make early detection of these diseases and cancers possible and beneficial. These monitoring procedures are different than that normally recommended in the absence of toxic exposures and are reasonably necessary due to Plaintiffs' and Class Members' exposures to the toxic substances, including vinyl chloride and its byproducts like hydrochloric acid and phosgene, released by the derailment, fire, and explosion.

142.     Due to Plaintiffs' and the Class's exposure to the toxic substances, toxic fumes and carcinogens, surveillance in the form of periodic medical examinations is reasonable and necessary, because such surveillance will provide early detection and diagnosis of the harmful and debilitating injuries resulting from exposure to the toxic substances, toxic fumes and carcinogens and, as a remedy for the conduct alleged.

143.     As a result, Plaintiff and the Class should be awarded the quantifiable costs of such

a monitoring regime.

144.    Defendants' conduct as alleged herein shows that Defendants acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

**COUNT V**
**PRIVATE NUISANCE**
*(On Behalf of All Plaintiffs Against All Defendants)*

145.    Plaintiffs repeat, reallege, and incorporate by reference all allegations in the preceding allegations of the Complaint as if fully set forth herein.

146.    Defendants have contaminated Plaintiffs' and Class Members' properties.

147.    Defendants knew or should have known that vinyl chloride, butyl acrylate, benzene residue, other combustible liquids, phosgene, and hydrogen chloride were hazardous and harmful to real property and human beings, and it was  substantially certain that improper transportation and handling of these materials would cause injury to Plaintiffs and their property.

148.    Defendants, through the negligent, reckless and/or intentional acts and omissions alleged herein, have contaminated real property located in the 30-mile radius surrounding the East Palestine derailment site.

149.    Defendants, through the negligent, reckless and/or intentional acts and omissions alleged herein, have released vinyl chloride, butyl acrylate, benzene residue, other combustible liquids, phosgene, and hydrogen chloride onto Plaintiffs' land and have contaminated Plaintiffs' real property, water and persons.

150.    The Defendants' contamination of Plaintiffs' real and personal property with vinyl chloride, butyl acrylate, benzene residue, and other toxic substances has unreasonably interfered with the rights of Plaintiffs to use and enjoy their property, causing them to suffer injuries different

in kind and degree from others in surrounding areas. Indeed, this interference is substantial in nature. It has caused and is causing Plaintiffs to, among other things, refrain from occupying or using their real properties, using contaminated water to drink, cook, bathe, irrigate farmland and gardens, eat from home gardens, or water pets and livestock. This has, in turn, caused significant loss of income, out of pocket expenses, emotional distress and inconvenience.

151.    Defendants' conduct has also substantially interfered with Plaintiffs' ability to enjoy their property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that they so choose. It has also reduced the value of their land.

152.    Defendants' negligent, reckless and/or intentional acts and omissions were unreasonable and constitute invasion of the property rights of Plaintiffs.

153.    Plaintiffs, unlike the public generally, have suffered specific injuries as a result of Defendants' tortious conduct, including the pollution of their land and water.

154.    Defendants' improper transportation and handling of vinyl chloride, butyl acrylate, benzene residue, and other combustible liquids, and the contamination of Plaintiffs' property resulting therefrom, constitutes a private nuisance. This nuisance has directly and proximately caused Plaintiffs to presently suffer, and continue suffering in the future, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience and emotional distress, an increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness.

155.    Defendants' conduct as alleged herein shows that Defendants acted maliciously,

with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

### COUNT VI
### PUBLIC NUISANCE
*(On Behalf of All Plaintiffs Against All Defendants)*

156.    Plaintiffs repeat, reallege, and incorporate by reference all allegations in the preceding allegations of the Complaint as if fully set forth herein.

157.    Defendants knew or should have known that vinyl chloride, butyl acrylate, benzene residue, and other combustible liquids were hazardous and harmful to real property and human beings, and it was substantially certain that improper transportation and handling of these materials was hazardous and harmful to people living in nearby areas.

158.    Plaintiffs and Class Members have a common right to enjoy their real property free of dangerous contamination, to breathe clean air and have access to clean running water without dangerous levels of toxic chemicals, and to live life without unreasonable exposure to toxic chemicals.

159.    Defendants' improper transportation and handling of vinyl chloride, butyl acrylate, benzene residue, and other combustible liquids substantially and unreasonably infringed upon and transgressed these public rights.

160.    As a proximate result of Defendants' improper transportation and handling of vinyl chloride, butyl acrylate, benzene residue, and other combustible liquids, Plaintiffs' and the general public's common right to breathe clean air and have access to clean running water without dangerous levels of toxic and harmful chemicals was severely diminished, if not eliminated.

161.    As a proximate result of Defendants' improper transportation and handling of vinyl chloride, butyl acrylate, benzene residue, and other combustible liquids, Defendants invaded and

contaminated the areas surrounding Plaintiffs' and Class Members' residences, thereby exposing them to toxic chemicals and carcinogens.

162.    As a direct and proximate result of Defendants' creation of a public nuisance and the public's exposure to toxic chemicals resulting therefrom, Plaintiff and Class Members presently suffer, and will continue to suffer, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, the necessity for annoyance, upset, aggravation and inconvenience, increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness.

163.    Defendants' conduct as alleged herein shows that Defendants acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

**COUNT VII**
**STATUTORY NUISANCE**
(*On Behalf of All Plaintiffs Against All Defendants*)

164.    Plaintiffs repeat, reallege, and incorporate by reference all allegations in the preceding allegations of the Complaint as if fully set forth herein.

165.    Per Pennsylvania Air Pollution Control Act, 35 P.S. § 4006.6, it is impermissible to emit air pollutants of hazardous materials in amounts greater than those sent by the Clean Air Act.

166.    Section 112 of the Clean Air Act included vinyl chloride in the list of hazardous air pollutants and set a national emission standard. 41 Fed. Reg. 46560 (1976).

167.    35 P.S. § 4013 declares any violation of the Air Pollution Control Act "shall constitute a public nuisance," and "[a]ny person who causes the public nuisance shall be liable for

the cost of abatement."

168.    Similarly, per Ohio R.C. § 3704.03, "no person shall cause, permit, or allow emission of an air contaminant in violation of any rule adopted by the director of environmental protection."

169.    As a result of the derailment and subsequent fire and toxic chemical burn, Defendants emitted impermissible amounts of vinyl chloride.

170.    As a result of Defendants' improper transportation and handling of vinyl chloride, butyl acrylate, benzene residue, and other combustible liquids, Plaintiff and Class Members have been exposed to hazardous air pollutants in violation of Pennsylvania, Ohio, and federal law.

171.    As a direct and proximate result of Defendants' improper transportation and handling of vinyl chloride, butyl acrylate, benzene residue, and other combustible liquids, these toxins continuously invaded and contaminated the areas surrounding Plaintiffs, thereby exposing their properties and body to unsafe levels of vinyl chloride, butyl acrylate, benzene residue, and other combustible liquids.

172.    As a direct and proximate result of Defendants' improper transportation and handling of vinyl chloride, butyl acrylate, benzene residue, and other combustible liquids, and the exposure to these toxins resulting therefrom, Plaintiffs presently suffer, and will continue suffering in the future, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience and emotional distress, an increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness.

173.    Defendants' conduct as alleged herein shows that Defendants acted maliciously,

with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

## COUNT VIII
## TRESPASS
(*On Behalf of All Plaintiffs Against All Defendants*)

174.    Plaintiffs repeat, reallege, and incorporate by reference all allegations in the preceding allegations of the Complaint as if fully set forth herein.

175.    At all times relevant hereto, Defendants knew or should have known vinyl chloride, butyl acetate, benzene residue, phosgene, and hydrogen chloride to be hazardous and harmful to real property, animals, and human beings, and it was substantially certain that their use, emission, discharge, disposal, distribution, spreading and/or release of these hazardous materials would cause injury to Plaintiff and their property.

176.    Defendants, through their activities alleged herein, allowed hazardous materials to enter and contaminate Plaintiffs' property. They intentionally, knowingly, and negligently used, discharged, spread, deposited and/or released these hazardous materials knowing that those toxins would contaminate the real property and drinking water of individuals like Plaintiffs.

177.    Defendants, through their activities alleged herein, authorized, requested, or caused others to dispose of waste in a manner which they knew was substantially likely to cause hazardous materials, including vinyl chloride, butyl acetate, benzene residue, phosgene, hydrogen chloride and/or other combustible liquids to enter and contaminate Plaintiffs' properties. Through their actions in intentionally causing others to spread their waste, they intentionally, knowingly, and negligently caused hazardous materials to enter Plaintiffs' land and water.

178.    At all relevant times Defendants were aware that their conduct in disposing of vinyl chloride, butyl acetate, benzene residue, phosgene, hydrogen chloride, and other combustible

33

liquids was contrary to Plaintiffs' rights in their property.

179.    At all times, Defendants' conduct displayed indifference to and disregard for Plaintiffs' rights to their land.

180.    Defendants, through their activities regarding hazardous materials alleged herein, failed to act in the matter of an ordinary, careful person or business.

181.    The Defendants' intentional, knowing, and negligent contamination, and continuing contamination, of Plaintiffs' real and personal property with hazardous materials has interfered with the rights of Plaintiffs to use and enjoy their property and constitutes trespass and continuing trespass. Defendants' trespass has substantially impaired Plaintiffs' rights in the use and enjoyment of their property as well as economic and property damages as alleged herein.

182.    Defendants' trespass has also interfered with and continues to interfere with Plaintiffs' ability to enjoy their property, to avail themselves of their property's value as an asset and/or source of collateral for financing, and to use their property in the manner that Plaintiffs so choose.

183.    Defendants' trespass has proximately caused, and will continue to cause, Plaintiffs real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience and emotional distress.

184.    Defendants' conduct as alleged herein shows that Defendants acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

**COUNT IX**
**WILLFUL AND WANTON CONDUCT**
*(On Behalf of All Plaintiffs Against All Defendants)*

34

185.    Plaintiffs repeat, reallege, and incorporate by reference all allegations in the preceding allegations of the Complaint as if fully set forth herein.

186.    At all times relevant, Defendants owed a duty to refrain from willful, wanton, reckless and outrageous conduct and/or conduct which exhibited an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiffs and the Class.

187.    Upon information and belief, Defendants were, at all times relevant, aware that vinyl chloride, butyl acetate, benzene residue, phosgene, and hydrogen chloride are highly carcinogenic, mutagenic and/or otherwise harmful to humans.

188.    Upon information and belief, Defendants were, at all times relevant, aware of the considerable health risks associated with the release of vinyl chloride, butyl acetate, benzene residue, phosgene, and hydrogen chloride into the air, water, and land, including the risk of causing various diseases and cancers in the surrounding population.

189.    Upon information and belief, Defendants were, at all times relevant, aware that their transportation and release of vinyl chloride, butyl acetate, benzene residue, phosgene, and hydrogen chloride could result in the unreasonably dangerous emission of hazardous materials into the surrounding communities.

190.    Upon information and belief, Defendants violated 49 CFR § 215.115(a)  for at least 20 miles by allowing a defect wheel bearing to remain in service before the derailment occurred.

191.    Notwithstanding this actual knowledge, and inconsistent with federal regulations and industry practice and procedures, Defendants breached their duties by, among other things:

> a)  Failing to operate, maintain, inspect and/or repair the railway and railcars in such a way to ensure their safe and proper operation, particularly when transporting hazardous materials such as vinyl chloride, butyl acetate, benzene residue, and other combustible liquids;
>
> b)  Failing to ensure proper procedures or systems for timely identifying any

35

malfunctions of the railway and railcars in order to prevent or mitigate derailments while transporting such hazardous materials;

c) Failing to ensure proper safety procedures in the event of a mechanical malfunction of the railway or railcars while transporting such hazardous materials;

d) Failing to ensure a proper mechanism for stopping or slowing malfunctioning railcars in a timely manner to avoid a derailment while transporting such hazardous materials;

e) Failing to prevent over-loading the train with too many railcars or materials;

f) Failing to load the railcars consistent with accepted practice;

g) Failing to load the railcars in a proper way, avoiding placement of heavier cars in the rear, with particular consideration to whether the planned route is downhill;

h) Failing to adequately staff positions that plan, prepare, coordinate, and oversee transportation of hazardous materials by railcar;

i) Failing to adequately hire, train, manage, oversee, and supervise their agents, servants, employees, including but not limited to the train engineer and dispatcher concerning the operation of the train on February 3, 2023;

j) Failing to adequately train their agents, servants, and employees, including but not limited to the train engineer, conductor and dispatcher, concerning the operation of the train and issues that arose on February 3, 2023;

k) Failing to properly determine the adequacy and skill of their agents, servants, employees, including but not limited to, the train engineer, conductor and dispatcher, concerning the operation of the train on February 3, 2023;

l) Failing to ensure that their agents, servants, employees, including but not limited to, the train engineer and dispatcher, were properly and adequately instructed and trained while transporting hazardous substances, including, but not limited to, vinyl chloride;

m) Failing to properly instruct and adequately train their agents, servants, employees, including but not limited to the train engineer and dispatcher concerning safety and emergency procedures in the event of a possible derailment;

n) Failing to route railcars carrying hazardous materials in such a way as to avoid populated areas in order to minimize the risk of accidental exposure;

o) Failing to adequately warn those in danger of exposure to hazardous chemicals;

p) Failing to institute proper procedures and training for response to the mechanical malfunction of a rail car;

q) Failing to institute proper procedures and training for response to derailment of railcars containing hazardous materials;

r) Failing to institute proper procedures to avoid exposing hazardous materials to the environment;

s) Failing to have an emergency response plan to contain the spread of hazardous materials into the surrounding air, water, real property, and persons in the event of derailment;

t) Failing to timely implement such an emergency response plan;

u) Failing to transport and handle hazardous materials in a manner which would not cause Plaintiffs injury or harm, as Plaintiffs were foreseeable victims located within the scope of the risk created by Defendants' conduct;

v) Failing to properly dispose of or otherwise eliminate the hazardous materials from the derailment site, including the use of techniques that further exposed Plaintiff and surrounding areas to phosgene and hydrogen chloride during a "controlled release" of the hazardous materials;

w) Failing to evacuate an appropriate geographical area to avoid exposing persons nearby to hazardous materials and causing injury;

x) Failing to timely evacuate an appropriate geographical area to avoid exposing persons nearby to hazardous materials and causing injury;

y) Accurately make known the risk of catastrophic injury and illness from exposure to hazardous materials, including vinyl chloride, butyl acetate, benzene residue, combustible liquids, phosgene, and hydrogen chloride, to persons at risk of exposure, including those outside the evacuation zone;

z) Accurately make known the risk of exposure faced by those persons at risk of exposure, including those outside the evacuation zone;

aa) Failing to contain the spread of hazardous materials and by-products, including vinyl chloride, butyl acetate, benzene residue, combustible liquids, phosgene, and hydrogen chloride, into the surrounding air, water, real property, and persons in order to avoid injury to;

bb) Failing to otherwise reasonably pack, transport, maintain, dispose of, or otherwise handle hazardous materials, including vinyl chloride, butyl acrylate, benzene residue, and other combustible liquids; and

cc) Otherwise unreasonably causing injury to Plaintiff in ways further investigation and discovery will reveal.

192.    Defendants' failures in these and other respects in the face of actual knowledge regarding the risks of unreasonable hazardous material discharge constitute willful, wanton, reckless and outrageous conduct, and demonstrates an utter indifference and/or conscious disregard to the health, safety, and well-being of Plaintiffs and Class Members.

193.    As a direct and proximate result of Defendants' willful, wanton, reckless and outrageous transportation, emission, discharge, and release of hazardous materials, including vinyl chloride, butyl acetate, benzene residue, phosgene, and hydrogen chloride, throughout the Class Zone, Plaintiffs presently suffer, and will continue suffering in the future, real property damage, out of pocket expense, personal property damage, loss of use and enjoyment of property, diminution in property value, loss of business income, loss of business goodwill, annoyance, upset, aggravation, inconvenience and emotional distress, an increased risk of associated disease or illness, and the present need for medical monitoring to ensure early detection of any such disease or illness.

194.    Defendants' conduct as alleged herein shows that Defendants acted maliciously, with aggravated or egregious fraud, and/or intentionally disregarded Plaintiffs' rights so as to warrant the imposition of punitive damages.

**COUNT X**
**ENVIRONMENTAL MONITORING**
*(On Behalf of All Plaintiffs and Against All Defendants)*

195.    Plaintiffs repeat, reallege, and incorporate by reference all allegations in the

38

preceding allegations of the Complaint as if fully rewritten herein.

196. The properties owned by and/or at which Plaintiffs and Class Members reside and/or operate its/their business or occupation have been significantly exposed to vinyl chloride and other toxic substances at levels that are far higher than normal background levels. These toxic substances, including vinyl chloride and its byproducts like hydrochloric acid and phosgene, are dangerous toxins that has been proven to cause cancer and other diseases in humans.

197. The hazardous materials carried by the train, including vinyl chloride, are highly toxic substances.

198. The chemicals dumped and released from the Train will not simply stay in one location. These chemicals will move through the air and water, including but not limited to movement from any soil into which the chemicals were initially released after rains and by other means.

199. Plaintiff and Class Members' properties at which they own, reside and/or conduct business were significantly exposed to these toxic substances, including vinyl chloride and its byproducts like hydrochloric acid and phosgene, due to Defendants' tortious actions, including Defendant's negligent, ultrahazardous, and willful and wanton conduct as alleged herein.

200. The presence of toxic chemicals on the properties increases the risk of cancer and other serious illnesses to those persons living or working at the properties.

201. The presence of toxic chemicals on the properties further injure the owners of such properties by decreasing the value of these properties.

202. Indeed, the mere risk of the presence of toxic chemicals on these properties from this notorious and well-publicized release of toxic chemicals can reasonably be expected to decrease the value of these properties.

203. Due to the economic, health, and other risks associated with the possibility of toxic chemicals on or about the Properties, which exposure is expected to take place over the span of time, necessitates monitoring for the presence of these toxic chemicals at the properties.

204. As a result, Plaintiff and the Class should be awarded the quantifiable costs of such a monitoring regime to determine the presence of such toxic chemicals in the air, water or soil of the properties so Defendants may remediate and remove all such toxic chemicals from the properties so that the Defendants are fairly, justly and properly placed in the position they were before the derailment.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of all Class Members proposed in this Complaint, respectfully request that the Court enter judgment in their favor and against each Defendant as follows:

a. For an Order certifying the Class, as defined herein, and appointing Plaintiffs and their Counsel to represent the Class;

b. For damages, including compensatory, punitive and exemplary damages, in an amount determined just and reasonable;

c. For an award of attorneys' fees, costs, and litigation expenses, as allowed by law;

d. For prejudgment interest on all amounts awarded;

e. For injunctive and declaratory relief, as allowed by law; and

f. Such other and further relief as this Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiffs demand a jury trial on all issues so triable.

Dated: February 24, 2023

40

WRIGHT & SCHULTE, LLC

/s/ Richard W. Schulte
Richard W. Schulte (0066031)
Roger Denton*
Stephen D. Behnke (0072805)
865 South Dixie Drive
Vandalia, Ohio  45377
(937)  435-7500
(937) 435-7511 (fax)
rschulte@yourlegalhelp.com
Attorney for Plaintiff

*Pro Hac Vice Forthcoming*